JDN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Susan Ramsey, as legal guardian of Travis Ramsey,

Plaintiff,

v.

City of Lake Havasu City, et al.,

Defendants.

No. CV-20-08189-PCT-DLR (ESW)

**ORDER**

Plaintiff Susan Ramsey, as legal guardian of Travis Ramsey ("Ramsey"), brought, through counsel, this civil rights action pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA), and state tort law against the City of Lake Havasu ("the City") and Police Officer Louis Hugh Plunkett, III. (Doc. 43.) Before the Court is Defendants' Motion for Summary Judgment. (Doc. 109.) The Court will grant the Motion in part and deny it in part.

## I. Background

Plaintiff's claims arose on August 5, 2019, when Ramsey appeared at the Lake Havasu City Municipal Court for a traffic violation. (Doc. 43 ¶¶ 7–8.) Ramsey has autism, which limits his ability to communicate and interact with other persons and his ability to be attentive. (*Id.* ¶ 2.) Plaintiff alleged that, prior to the court hearing, Ramsey went to the courthouse, provided medical documentation of his disability, and requested an accommodation. (*Id.* ¶ 12.) Also, at the start of the hearing, Ramsey and Plaintiff

requested an accommodation to assist Ramsey. (*Id.*) Plaintiff alleged that no accommodations were made for Ramsey, and, at the hearing, the judge refused to consider Ramsey's evidence, found him responsible, and fined him. (*Id.* ¶ 9.) After Ramsey verbally expressed his disbelief in the proceedings, the judge ordered Ramsey to leave the courtroom. (*Id.* ¶ 10.) As he did so, Defendant Plunkett and other Officers grabbed Ramsey and assaulted him, and then Defendant Plunkett shot Ramsey twice in the chest with a taser. (*Id.*) Ramsey was arrested and detained in jail for 24 hours. (*Id.* ¶ 11.)

Plaintiff set forth four counts against Defendants: Count One asserts that Defendant Plunkett violated Ramsey's Fourth Amendment right to be free from excessive force when he tased Ramsey; Count Two asserts that the City violated Ramsey's rights under the RA; Count Three asserts that the City violated Ramsey's rights under the ADA; and Count Four asserts that Defendant Plunkett and the City—based on vicarious liability—committed assault and battery under state law. (*Id.* at 9.)

Defendants move for summary judgment on the grounds that (1) Plaintiff's excessive force claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) Defendant Plunkett is entitled to absolute immunity; (3) Defendant Plunkett is entitled to qualified immunity; (3) Plaintiff cannot produce evidence to support the elements of an RA or ADA claim; (5) Defendant Plunkett's use of force was justified under state law; and (6) punitive damages are not allowed under state law. (Doc. 109).

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099,

1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Dismissal of Count Two—RA Claim**

In her Response to Defendants' Motion for Summary Judgment, Plaintiff states that she does not oppose dismissal of the RA claim in Count Two because it is duplicative of the ADA claims. (Doc. 129 at 2.) Accordingly, the Court will dismiss Count Two.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

## IV. Relevant Facts[1]

Ramsey, a 28-year-old man, has autism, which limits his ability to communicate with other persons, to be employed, and to be a dependable worker, and he suffers from anxiety when interacting with others. (Doc. 130, Pl.'s Statement of Facts (PSOF) ¶ 1.) Ramsey receives social security disability benefits because of his mental disabilities. (*Id.* ¶ 2.)

On June 21, 2019, Officer Dailey pulled Ramsey over for driving on a suspended license and no proof of insurance. (Doc. 110, Defs.' Statement of Facts (DSOF) ¶ 3.)

A civil traffic hearing for Ramsey's ticket was scheduled for August 5, 2019, at the Lake Havasu City Municipal Court. (*Id.* ¶ 1.) About a week or two before the hearing, Ramsey went to the Municipal Court, spoke to a Court Clerk, informed her of his upcoming hearing, provided his psychiatric records, and requested an accommodation related to "communication barriers." (Doc. 130, PSOF ¶ 6; Doc. 130-1 at 155, Ramsey Dep. 74:15–11, Aug. 29, 2022.) The Court Clerk told him she would put the records in his file "so they know." (Doc. 130-1 at 155, Ramsey Dep. 75:11–13.) Ramsey was not provided any forms for requesting an accommodation for the court hearing. (Doc. 130-1 at 7, Blake Dep. 31:1–8, March 22, 2023; Doc. 130-1 at 58–60, Mason Dep. 23:23–25:2, 27:14–23, March 7, 2023.)

Plaintiff accompanied Ramsey to the August 5, 2019 court hearing. (Doc. 130, PSOF ¶ 9.) Also in the courtroom were Officer Dailey, Defendant Plunkett, and two other City Police Officers, who were all waiting to testify in traffic cases scheduled for that day.

---

[1] The evidence includes video footage from Defendant Plunkett's body cam. (Doc. 17.) At summary judgment, the Court must take as true Plaintiff's version of the facts and the facts as depicted in the video of the incident. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

(Doc. 110, DSOF ¶ 4; Doc. 110-1 at 2-3, Plunkett Decl. ¶¶ 4, 7, 21.) Before Ramsey's case was called, Ramsey saw Officer Dailey, went and sat by him, and gave him the proof of insurance that Ramsey did not have at the time of the traffic stop. (Doc. 110, DSOF ¶ 6; Doc. 130, PSOF 8.) Officer Dailey said, "what are you doing? Go over there." (Doc. 130, PSOF ¶ 8; Doc. 130-1 at 152, Ramsey Dep. 63:4–21, Aug. 29, 2022.) Ramsey also turned to speak to other citizens in the courtroom. (Doc. 110, DSOF ¶ 6; Doc. 130, Pl.'s Resp. to DSOF (PRDSF) ¶ 6.) At least twice, Judge Dunbar had to stop the hearing that was in progress to tell Ramsey to stop talking. (Doc. 110; DSOF ¶¶ 7–8; Doc. 130, PRDSF ¶¶ 7–8.) Ramsey responded that he did not understand because he had autism. (Doc. 110, DSOF ¶ 9; Doc. 130, PRDSF ¶ 9.) Judge Dunbar again told Ramsey to stop talking, and Ramsey remained quiet until his case was called. (Doc. 110, DSOF ¶ 10; Doc. 130, PRDSF ¶ 10.)

When Ramsey's case was called, both he and Plaintiff stated in open court that Ramsey was autistic and needed Plaintiff's assistance to present his defense. (Doc. 130, PSOF ¶ 9.) Ramsey told the judge he had a disability, and Plaintiff also stood up and stated that the Judge needed to allow her son certain rights due to his disability. (Doc. 130-2 at 13–14.)[2] Judge Dunbar refused to let Plaintiff further address the Court on Ramsey's behalf. (Doc. 130, PSOF ¶ 10.) During the hearing, Judge Dunbar refused to accept Ramsey's offer to present his proof of insurance documents. (*Id.*) Ramsey began to argue with the Judge and, at some point, Ramsey stood up. (Doc. 110, DSOF ¶¶ 11–12 (in part).) Officer Dailey also stood up and approached Ramsey, and then he remained standing next to Ramsey. (*Id.* ¶¶ 13–15 (in part); Doc. 130, PRSDF ¶¶ 13–15 (in part).) Judge Dunbar told Ramsey to sit down and stop talking, which Ramsey did, and the hearing continued. (Doc. 110, DSOF ¶¶ 16–17; Doc. 130, PRDSF ¶¶ 16–17.)

---

[2] The Court relies on Officer Sondrol's police report of the August 5, 2019 incident, which included Officer Sondrol's observations of what transpired at the court hearing. (Doc. 130-2 at 13–14.) *See* Fed. R. Evid. 803(8); *Blanton v. Cnty. of Sacramento*, No. 2:09-cv-01832, 2012 WL 2798920, at *1 n.4 (E.D. Cal. 2012) ("[t]he police officer's statements and observations recorded in a police report are admissible, as is the summary of [plaintiff's] statement made to [the officer] under the public-records hearsay exception contained in Fed. R. Evid. 803(8)").

Ramsey requested a continuance of the hearing until he could have an attorney present, but Judge Dunbar refused his request. (Doc. 110, DSOF ¶ 18; Doc. 130, PRDSF ¶ ¶18 & PSOF ¶ 11.) At some point during the hearing, and while Ramsey was arguing with Judge Dunbar, Ramsey appeared to be recording the proceeding with his cell phone. (Doc. 110, DSOF ¶ 20; Doc. 130, PRDSF ¶ 20.) Judge Dunbar told the Bailiff to confiscate the cell phone until the hearing was over; Ramsey stood back up, moved his cell phone away, and refused to give it to the Bailiff. (Doc. 110, DSOF ¶ 21; Doc. 130, PRDSF ¶ 21.)

As Ramsey was speaking with Judge Dunbar, he was leaning over with his hands on the table, breathing heavily, bouncing his right leg, and at times forcefully pointing toward the Judge with his right hand. (Doc. 110, DSOF ¶ 22 (in part); Doc. 130, PRDSF ¶ 22.) Defendant Plunkett and one of the other Officers got up and stood behind Ramsey. (Doc. 110, DSOF ¶ 23 (in part); Doc. 130, PRDSF ¶ 23.) Ramsey continued to look back and forth from Defendant Plunkett to Judge Dunbar. (Doc. 110, DSOF ¶ 24; Doc. 130, PRDSF ¶ 24.)

At this point, the body cam video starts. (Doc. 116, Video.) Judge Dunbar announced his finding that Ramsey was responsible on the proof of insurance citation. (*Id.* 00.15–00.21.) Ramsey stated, "but I just showed you proof of insurance," to which Judge responded, "I didn't ask you anything." (*Id.* 00.23–00.29.) Judge Dunbar then said, "remove him from the courtroom." (*Id.* 00.34–00.36.)

As Ramsey turned to leave, Defendant Plunkett moved toward Ramsey and attempted to grab Ramsey's right arm. (*Id.* 00.36–00.37.) Ramsey moved his arm up to avoid Defendant Plunkett's grab and said, "don't touch me man." (*Id.* 00.37–00.38.) As Ramsey walked towards the courtroom exit, Defendant Plunkett said, "don't pull away," and he grabbed Ramsey's right bicep. (*Id.* 00.40–00.41.) Defendant Plunkett said, "walk out of the courtroom." (*Id.* 00.42–00.44.) Ramsey continued to walk out of the courtroom door while saying, "do not touch me"; Defendant Plunkett continued to hold Ramsey's right bicep. (*Id.* 00.41–00.45.) Ramsey walked out of the courtroom door, turned to his left, tried to pull his right arm from Defendant Plunkett, and again said, "do not touch me

man." (*Id.* 00.46–00.47.) Ramsey entered the hallway and said to an Officer who had been behind him, "I did not assault you; do not touch me." (*Id.* 00.49–00.50.) Ramsey took a couple more steps into the hall and said again, "do not touch me." (*Id.*, 00.51–00.54.) Defendant Plunkett and another Officer were still trying to hold on to Ramsey as Ramsey appeared to try to pull away when, suddenly, Defendant Plunkett stated, "he's in custody," and the Officers tried to take Ramsey to the ground. (*Id.* 00.55–00.59.) Ramsey clenched his right fist and jerked from side to side to try to get free of the Officers, and he stated, "get off me, I said get off me"; one Officer held his right arm, another held his left arm, and a third Officer put one arm around Ramsey's neck. (*Id.* 1.00–1.02.)[3] Ramsey was being held like this as he tried to twist his body, and he was almost sitting down on the hallway floor when Defendant Plunkett quickly said, "taser, taser, taser, taser" and immediately fired his taser in dart mode into Ramsey's chest. (*Id.* 1:02–1.03.)

Ramsey yelled in pain, the Officers released their hold on Ramsey, and Ramsey was temporarily paralyzed while lying on the floor. (*Id.* 1.03–1.06.) The three Officers then grabbed Ramsey's arms, Defendant Plunkett ordered Ramsey to put his hands behind his back, and the Officers turned Ramsey on his side and handcuffed him. (*Id.* 1.06–1.23.) As he laid on the floor recovering from the taser impact, Ramsey moaned, "that hurt so bad," "I didn't do anything," and "I was leaving, I was leaving of my own free will." (*Id.* 1.24–2.25.) After a minute, the Officers sat Ramsey up, and he said to them, "don't touch me, you're not a doctor, don't touch me," to which one Officer said, "we have to pick you up man." (*Id.* 2:50–2:59.) Ramsey repeated, "don't touch me, I want a doctor." (*Id.* 3:00–3.05.) The Officers assured Ramsey that they would get medics, and they asked if he wanted to sit on the bench in the hallway. (*Id.* 3.06–3.19.) Ramsey responded that he wanted to go outside and that he thought he was going to pass out. (*Id.* 3.19–3.21.) The

---

[3] Plaintiff asserts that the officer placed Ramsey in a life-threatening choke hold. (Doc. 129 at 4.) Defendants assert that the officer used a carotid control technique. (Doc. 110 ¶ 35.)

Officers stood Ramsey up and escorted him out of the Municipal Courthouse without incident. (*Id.* 3.21–4.20.)

Ramsey was later transported to the Havasu Regional Medical Center for treatment of his injuries. (Doc. 110, DSOF ¶ 55; Doc. 130, PRDSF ¶ 55.) After hospital staff finished treating Ramsey, he was cleared for booking. (Doc. 110, DSOF ¶ 57; Doc. 130, ¶ 57.) Ramsey was booked into jail for charges of disorderly conduct and resisting arrest. (Doc. 110, DSOF ¶ 58; Doc. 130, PRDSF ¶ 58.)

Ramsey was convicted of resisting arrest under Arizona Revised Statute 13-2508(A)(3), which provides that a person commits resisting arrest when they intentionally prevent or attempt to prevent a peace officer from effecting an arrest by "engaging in passive resistance." (Doc. 130, PSOF ¶ 27.)

Ramsey subsequently appealed the judgment of responsible for driving without proof of insurance to the Mohave County Superior Court, which reversed the Lake Havasu City Court judgment and found that Ramsey had produced proof of insurance. (*Id.* ¶ 26.)

## V. Count One—Fourth Amendment Excessive Force Claim Against Plunkett

### A. *Heck v. Humphrey*

#### 1. Governing Standard

In *Heck*, the Court held that a prisoner's claim for damages cannot be brought under § 1983 if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner demonstrates that the conviction or sentence has previously been reversed, expunged, or otherwise invalidated. 512 U.S. at 486–87. The Supreme Court has since emphasized that it was "careful in *Heck* to stress the importance of the term 'necessarily.'" *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1005 (9th Cir. 2022) (en banc) (quoting *Nelson v. Campbell*, 541 U.S. 637, 647 (2004)). "To decide whether success on a section 1983 claim would necessarily imply the invalidity of a conviction, we must determine which acts formed the basis for the conviction." *Id.* at 1006.

The defendant bears the burden of demonstrating that the plaintiff's success on his excessive force claim would necessarily imply the invalidity of his state-court conviction.

*See, e.g.*, *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1046 (9th Cir. 2018) (holding that *Heck* did not bar the plaintiff's § 1983 claims because "Defendants have not demonstrated that Reese's claims in this action are barred by *Heck*"); *Jarboe v. Cnty. of Orange*, 293 Fed. App'x 520, 521 (9th Cir. 2008) ("where the defendant relies on *Heck*, he has the burden of proving that the plaintiff's success will necessarily imply the invalidity of the plaintiff's underlying conviction").

**2. Discussion**

Plaintiff was found guilty of resisting arrest in violation of Arizona Revised Statues § 13-2508(A)(3), which provides that a person commits resisting arrest by intentionally preventing or attempting to prevent a known peace officer from effecting an arrest by "engaging in passive resistance." According to the record, it appears that Plaintiff was convicted of this offense after a bench trial. (Doc. 110-7 at 5, Pl. Dep. 114:8–9, 23–1; 115:18–24.)[4] There is no dispute that Plaintiff's conviction has not been overturned, reversed, expunged, or otherwise invalidated. (Doc. 110, DSOF ¶ 59; Doc. 130, PRDSF ¶ 59.)

Defendants argue that because a criminal defendant can only be convicted of resisting arrest if the officer's conduct was "lawful"—that is, did not include excessive force—when effecting the arrest, Ramsey's conviction for resisting arrest is a *Heck*-bar to an excessive force claim. (Doc. 109 at 8.) Defendants contend that, as shown on the video, Ramsey's resistance was "continuous" until Defendant Plunkett deployed the taser, and, because use of the taser occurred during the "arrest phase" of Defendant Plunkett's conduct, during which Ramsey's resistance was continuous, *Heck* bars Plaintiff's excessive force claim. (*Id.* at 9.)

---

[4] In that part of their Reply discussing qualified immunity, Defendants refer to Ramsey's "plea to passive resistance to arrest," and state that Ramsey "may have been lucky to escape with a plea to 'passive resistance.'" (Doc. 131 at 8.) As discussed herein, it is not clear from the record whether Ramsey was convicted in a bench trial, as he suggested in his deposition, or entered a plea.

Defendants' arguments rely on the Ninth Circuit's decision in *Smith v. City of Hemet*. (*Id.*) In *Smith*, officers responded to a domestic violence call and arrived to find Smith on his front porch. 394 F.3d at 693. Smith refused to respond to instructions to remove his hands from his pockets, and then he entered the house. *Id.* Smith came back onto the porch and removed his hands from his pockets, but he refused to follow orders to put his hands on his head and walk towards the officers or to turn around and place his hands on his head. *Id.* at 693–94. Smith continued to refuse to cooperate even after he was told that a police canine could be sent to subdue him and might bite. *Id.* at 694. One officer sprayed Smith with pepper spray, and other officers grabbed him from behind and threw him down, after which the canine was ordered to attack. *Id.* After the canine bit Smith, he submitted to arrest; however, he was down on the ground and one hand was tucked under Smith and out of officers' view. *Id.* As one officer attempted to secure both arms, the canine was instructed to bite Smith a second time; Smith was then dragged off the porch, and the canine was ordered to bite Smith a third time, after which Smith was handcuffed. *Id.* During this incident, Smith was pepper-sprayed at least four times, including twice after the canine had seized him and officers had pinned him to the ground. *Id.* Thereafter, Smith pleaded guilty to resisting arrest. *Id*

The *Smith* court separated the officers' actions into stages; the investigative phase, during which Smith refused to cooperate, and the arrest phase, during which the officers used physical force. 394 F.3d at 697–98. The Court held that if Smith's conviction was for resisting the officers during the "investigative phase," i.e., before the officers had begun to arrest and use force against him, then *Heck* did not bar his claim and the force was excessive. *Id.* at 698. But if Smith's conviction was for resisting the officers while they were effecting arrest and using purportedly excessive force, then *Heck* did bar his claim that the officers used excessive force. *Id.* at 698–99.

Six years after deciding *Smith*, the Ninth Circuit clarified that in some cases, there may not be distinct phases of a police encounter, and it held that a "conviction [for resisting arrest] does not bar a § 1983 claim for excessive force under *Heck* when the conviction and

the § 1983 claim are based on different actions during 'one continuous transaction.'" *Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1131, 1134 (9th Cir. 2011). In *Hooper*, an officer grabbed Hooper's wrist and told her she was under arrest for possession of methamphetamine; she jerked her hand away, and a struggle ensued. *Id.* at 1129. Hooper ended up on the ground, lying on her stomach, with the officer on her back. *Id.* According to Hooper's facts, while on the ground, she briefly struggled by "jerking side to side," but then stopped when the officer got both her hands behind her back and instructed her to stop. *Id.* While the officer was waiting for backup assistance, he called his canine, Kojo, who bit Hooper's head and caused significant injuries. *Id.* The time from the officer grabbing Hooper's wrist until after Kojo's bite and the arrival of back up occurred in a span of 45 seconds. *Id.*

Hooper was convicted of resisting arrest, and she did not dispute that she resisted the officer in the course of his duties; however, she claimed that the officer used excessive force in response to her resistance thereafter when he called his canine to assist in the arrest. *Id.*

The Ninth Circuit distinguished *Hooper* from *Smith*; "in Hooper's case, unlike in Smith's, there were no distinct phases. Rather, Hooper's arrest was effectuated in a single continuous chain of events lasting a very brief time." *Id.* The "chain of events" of Hooper's arrest was "one continuous transaction." *Id.* The appellate court stated that a holding in Hooper's § 1983 action that use of a canine was excessive force would not necessarily imply the invalidity of her resisting arrest conviction. *Id.* In finding that Hooper's excessive force claim was not barred under *Heck*, the Court explained that a "defendant might resist a lawful arrest, to which the arresting officers might respond with excessive force to subdue him." *Id.* at 1132; *see Sants v. Seipert*, No. 2:15-cv-0355-KJM-CKD, 2019 WL 2577307, at *3 (E.D. Cal. June 24, 2019) (explaining that, under *Hooper*, "in the course of a continuous arrest sequence, two things can be true at once: (1) an officer can lawfully arrest a suspect for resisting arrest, and (2) he can also unlawfully use excessive force while doing so").

Here, there were not separate investigative and arrest phases in the encounter with Ramsey. The encounter began in the courtroom when Defendant Plunkett attempted to grab Ramsey's arm and Ramsey pulled his arm away, and it ended in the hallway after Defendant Plunkett shot Ramsey with the taser and Ramsey crumpled on the floor—a span of about 30 seconds. (Doc. 116, Video 00.37–1.07.) Like *Hooper*, Ramsey's arrest "was effectuated in a single continuous chain of events lasting a very brief time." 629 F.3d at 1132. Thus, the question presented is whether Ramsey's resisting arrest conviction and the § 1983 excessive force claim "are based on different actions during one continuous transaction." *Id.* at 1134.

To answer that question, the Court must determine which acts of Ramsey's formed the basis for his resisting arrest conviction. *Lemos*, 40 F.4th at 1006. If the prior conviction arose out of a guilty plea, the court must look "at the record to see which acts formed the basis for the plea." *Id.* If the conviction was based on a jury verdict, the court must look at the criminal case record, including jury instructions, to determine which facts the jury necessarily found to support the conviction. *Id.* The Ninth Circuit has emphasized that, regardless of whether the conviction is based on a guilty plea or jury verdict, "*Heck* requires looking at the factual basis for a conviction." *Id.* at 1008.

According to the record, Ramsey was convicted of resisting arrest in violation of Arizona Revised Statues § 13-2508(A)(3) either after a bench trial or pursuant to a plea. (Doc. 110-7 at 5, Pl. Dep. 114:8–9, 23–1; 115:18–24.) In either instance, Defendants did not submit any evidence to show which facts formed the basis of the Ramsey's conviction. Defendants identify various actions by Ramsey which they claim support that his resistance was "continuous"—pulling his arm away to prevent Defendant Plunkett from grabbing it; pulling away from Plunkett and stating "do not touch me"; twisting around and trying to pull his arms away from Officers' grasp; trying to yank his right arm away from the Officers' grasp; refusing to obey commands; jerking from side to side; yelling "get off"; continuing to twist his body; and clenching his right arm. (Doc. 109 at 6–7, 9.) But Defendants fail to cite to a superior court minute order, trial hearing transcript, plea

document, or any other evidence to establish which of these actions constituted the factual basis for Ramsey's resisting arrest conviction.[5]

If Ramsey's resisting arrest conviction was based on his initial actions of pulling his arm away from Defendant Plunkett, or twisting around to try to escape Officers' grasp after he exited the courtroom, or even jerking side to side before two Officers held each of his arms and another Officer held his head in a carotid control technique, Ramsey could have resisted a lawful arrest *and* Defendant Plunkett could have responded with excessive force to subdue him. *See Hooper*, 629 F.3d at 1132.

Notably, even in *Smith*, on which Defendants rely, the Ninth Circuit found that, although the record was clear that Smith pleaded guilty to resisting arrest, "nothing in the record informs us what the factual basis for [Smith's] plea was." 394 F.3d at 698. There was no evidence whether Smith's plea was based on his actions that impeded the officers' investigation before they came onto the porch or his subsequent resistance to the officers' physical attempt to arrest him, or both. *Id.* Because the Court could not determine the factual basis of Smith's plea, his § 1983 action did not necessarily imply the invalidity of his conviction, and his excessive force claim was not barred by *Heck*. *Id.* at 699.

Because Defendants have failed to present evidence of the factual basis for Ramsey's resisting arrest conviction, they fail to satisfy their initial evidentiary burden, and the Court cannot determine whether success on Ramsey's excessive force claim would necessarily imply the invalidity of his resisting arrest conviction. Defendants' request for summary judgment based on *Heck* will be denied.

### B. Absolute Immunity

#### 1. Legal Standard

"[A]bsolute judicial immunity insulates judges from charges of erroneous acts or irregular action." *In re Castillo*, 297 F.3d 940, 947 (9th Cir. 2002) (citing *Forrester v.*

---

[5] The only court documents Defendants submitted were copies of the "Determination of Release Conditions and Release Order" and "Order Imposing Terms of Probation." (Doc. 110-10 at 2–4.) Neither of these Orders include the factual basis of Ramsey's resisting arrest conviction. (*See id.*)

*White*, 484 U.S. 219, 227–28 (1988)). Absolute judicial immunity "extends to nonjudicial officers for all claims relating to the exercise of judicial functions." *Id.* (internal quotation omitted). For absolute immunity to apply to a nonjudicial officer, the function performed must be closely associated with the judicial process. *Id.* at 948. The function must be "functionally comparable to" a judge's; it must "involve the exercise of discretion in resolving disputes." *Id.* "The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432, (1993).

The Supreme Court has found that absolute judicial immunity extends to (1) prosecutors, when initiating a prosecution and presenting a case or taking acts in preparation for a trial; (2) administrative law judges and agency hearing officers who are performing adjudicative functions; (3) agency officials performing functions analogous to a prosecutor; (4) agency attorneys preparing for presentation of evidence in an administrative adjudication; and (5) individuals participating in the judicial process, such as jurors, advocates, and witnesses. *Id.* (internal citations omitted.) The Ninth Circuit has also extended quasi-judicial immunity to bankruptcy trustees, *id.*, and court-appointed special masters. *Atkinson–Baker & Assocs., Inc. v. Kolts*, 7 F.3d 1452, 1455 (9th Cir. 1993).

**2. Discussion**

Defendants argue that Plunkett is entitled to absolute immunity because he used force to remove Ramsey from the courtroom based on the Judge's order. (Doc. 109 at 10.) Defendants maintain that, because absolute immunity would protect the Judge, the immunity extends to Plunkett. (*Id.*) Plaintiff contends that there is no evidence the Judge gave any direction to Plunkett individually; rather, the order was directed to the court's bailiff. (Doc. 129 at 11; Doc. 130 27.) Plaintiff also contends that, regardless, Plunkett's conduct far exceeded the Judge's directions, and absolute immunity would only be a defense for the Judge. (Doc. 129 at 11.)

Defendant Plunkett relies on the Ninth Circuit's decision in *Forrester v. White* for the proposition that absolute judicial immunity extends to Executive Branch officials. (*Id.*, citing 484 U.S. at 225. *Forrester* noted, however, that absolute immunity was limited to Executive Branch officials "who perform quasi-judicial functions" or prosecutorial functions "intimately associated with the judicial phase of the criminal process." *Id.* at 225–26 (citing *Butz v. Economou*, 438 U.S. 478, 513 (1978) (holding that absolute judicial immunity protects agency hearing examiners and administrative judges for their judicial acts because their roles are "functionally comparable" to that of a judge)). Indeed, the *Forrester* decision denied absolute immunity to a state court judge after he was sued for demoting and firing a probation officer because those decisions were not adjudicative or judicial in nature; rather, they were administrative functions. *Id.* at 229–30. Defendants do not demonstrate how Defendant Plunkett's use of force to remove Ramsey from the courtroom was like the role of judge or how Defendant Plunkett's action involved judicial or adjudicative decisions such that it would constitute a quasi-judicial function.

Defendants also rely on the Supreme Court's decision in *Mireles v. Waco,* 502 U.S. 9 (1991). In *Mireles*, the plaintiff—a defense attorney—failed to appear for the initial call of the judge's morning calendar, so Judge Mireles ordered two police officers "to forcibly and with excessive force seize and bring plaintiff into his courtroom." *Id.* at 10.) The two officers used unreasonable force and violence to seize the plaintiff from another courtroom and then "slam[] him through the doors" into Judge Mireles' courtroom. *Id.* The plaintiff sued Judge Mireles and the two officers. (*Id.*) The Supreme Court found that, because Judge Mireles' alleged actions were taken in his judicial capacity, he was absolutely immune from suit. *Id.* at 12–13.)

Plaintiff asserts that *Mireles* provides a judicial immunity defense for a judge only. (Doc. 129 at 11.) The Court agrees. The *Mireles* decision did not address immunity for the two officers who acted pursuant to Judge Mireles' order. *See* 502 U.S. 9.

In *Arnold v. County of El Dorado*, the Eastern District of California district court considered an absolute judicial immunity claim by a bailiff who was ordered to remove a

litigant from the courtroom. No. S-10-3119 KJM GGH PS, 2011 WL 902204 (E.D. Cal. March 15, 2011), *report and recommendation adopted*, 2011 WL 4344178 (E.D. Cal. Sept. 14, 2011). There, the plaintiff was in the courtroom requesting a continuance in a family law matter—due to a recent car accident—when the judge became angry and ordered her removal from the courtroom. *Id.*, at 2. Even though the plaintiff was slowly leaving the courtroom, while using crutches and wearing a cast, the defendant deputy sheriff forcibly pushed her in the back, grabbed her right upper arm, wrenched both her arms behind her back, and jerked her backward, causing her to hit the floor. *Id.* The deputy sheriff moved to dismiss the claim against him, arguing that, as an officer of the court, he was entitled to quasi-judicial immunity because he was acting pursuant to a judge's orders. *Id.* at *3. The district court rejected the deputy sheriff's argument and found that absolute quasi-judicial immunity did not apply. *Id.*, at *5. The district court explained that "there is a difference from a bailiff executing an order of the court in a reasonable manner (quasi-judicial absolute immunity), and executing an order in a manner which violates constitutional rights." *Id.*, at *6. The district court found that, taking the plaintiff's facts as true, the judge's order was carried out in a manner not authorized by the order itself; "[e]xcessive force in carrying out the order does not stem from the nature of the judicial act as the judge did not authorize the amount of force actually used by officers." *Id.*, at *5; *see Richman v. Sheahan*, 270 F.3d 430, 433–34 (7th Cir. 2001) (finding no absolute quasi-judicial immunity for defendant deputies where, during the plaintiff's appearance for a traffic ticket, the judge ordered the plaintiff's son—who was physically disabled and used a cane—to be restrained, and deputies forced him to the floor, sat on him and handcuffed him, after which he appeared to stop breathing and was taken to the hospital, where he was pronounced dead); *Martin v. Bd. of County Comm'rs*, 909 F.2d 402, 405 (10th Cir. 1990) (concluding that defendant sheriff's deputies who allegedly used excessive force while executing an order for an arrest warrant were not entitled to absolute immunity; "absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its execution"); *but see Martin v.*

*Hendren*, 127 F.3d 720 (8th Cir. 1997) (finding that defendant court officer was entitled to absolute quasi-judicial immunity after judge ordered him to remove the plaintiff from the courtroom and to handcuff the plaintiff, and the defendant allegedly used excessive force to do so; "bailiffs enjoy absolute quasi-judicial immunity for actions specifically ordered by the trial judge and related to the judicial function") (internal quotation omitted)).

In the instant case, Defendant Plunkett was in the gallery of the courtroom waiting to testify as a witness in a separate traffic case; he was not the bailiff or court officer to whom the judge directed the order to remove Ramsey from the courtroom. As Plaintiff notes, the court's bailiff was present, and she was standing right next to Ramsey when the judge ordered him to be removed from the courtroom. (Doc. 130 ¶ 27; Doc. 116, Video 00:34–36.) In her deposition, the bailiff—Officer Richardson—testified that when the judge issued the order to remove Ramsey from the courtroom, it was her duty as bailiff to remove him. (Doc. 110-5 at 6, Richardson Dep. 70:6–13, Dec. 9, 2022.) Even assuming, arguendo, that Defendant Plunkett was a court officer in the situation, any actions he took after Ramsey was out of the courtroom and in the hallway were beyond what was authorized by the judge's order and, therefore, not protected by absolute immunity. Further, Defendant Plunkett would not be entitled to absolute immunity for carrying out the order in a manner that violated Ramsey's constitutional rights.

For the above, reasons, Defendants' request for absolute quasi-judicial immunity as to the excessive force claim against Defendant Plunkett will be denied.

**C. Qualified Immunity**

**1. Legal Standard**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–

32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case). In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).

Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117–18. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Hope*, 536 U.S. at 741). This principle is particularly relevant "in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Id.*; *see Drummond v. City of Anaheim*, 343 F.3d 1052, 62 (9th Cir. 2003) (holding that "no federal case directly on point [was needed] to establish" that the conduct at issue violated clearly established law and constituted excessive force).

**2. Discussion**

**a. Constitutional Violation**

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment "reasonableness" standard. *Graham*, 490 U.S. at 395. This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.* To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396–97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citations omitted). "Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); *see Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering officer's failure to warn plaintiff that he would be shot if he did not comply with the officer's orders and what other tactics, if any, were available to effect the arrest in determining whether force used was reasonable).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

**i) Nature of Force**

The analysis first considers the type and amount of force inflicted. *Espinosa*, 598 F.3d at 537. "[E]ven where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

Defendant Plunkett shot Ramsey twice with a taser in dart mode. A taser in dart mode delivers "a 1200 volt, low ampere electrical charge" that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body and leaving the target limp and helpless." *Mattos*, 661 F.3d at 443 (internal citation and quotation omitted). A taser causes "physiological effects," "intense" pain, and results in "immobilization, disorientation, loss of balance, and weakness." *Bryan*, 630 F.3d at 825. Because a taser shot delivers a "painful and frightening blow," it constitutes an

"intermediate, significant level of force that must be justified by the governmental interest involved." *Id.* at 826; *Mattos*, 661 F.3d at 443.

**ii) Governmental Interests**

Whether Defendant Plunkett's use of intermediate, significant force was reasonable depends on the government interests at stake, which requires analyzing the severity of Ramsey's crime, the threat posed by Ramsey, and whether Ramsey was resisting or evading arrest. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396–97.

More serious crimes may require greater levels of force to apprehend the subject. *See Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1297 (D. Idaho 2011). Ramsey had just been found responsible for a minor traffic violation; however, he did not commit any crime, nor was he suspected of committing a crime, while in the courtroom. The video evidence shows that when the judge ordered that Ramsey be removed from the courtroom, Ramsey turned to walk out of the courtroom. Although he was leaving the courtroom, Defendant Plunkett grabbed Ramsey's arm, and did not let go after they exited the courtroom. (Doc. 116, Video, 00:36–00:52.) This resulted in Ramsey trying to walk away from the officers, clenching up, and jerking from side to side. (*Id.*, 00:52–1:00.) As discussed above, the record does not show which of Ramsey's actions was the basis for his resisting arrest conviction. But his conviction was a misdemeanor for "engaging in passive resistance," which is defined as "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest." Ariz. Rev. Stat. 13-2508(A)(3), (B), (C). Under these circumstances, the nature of Ramsey's resisting arrest crime provided little basis for Defendant Plunkett's use of significant force. *See Smith*, 394 F.3d at 703. Thus, the first *Graham* factor favors Plaintiff.

The "most important *Graham* factor" is whether Plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441. When considering whether there was an immediate threat, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (citation and quotation omitted). Defendants

assert that Ramsey's "aggressive demeanor, resistive actions in the courtroom, and assaultive conduct in the hallway posed an immediate threat to the safety of Judge Dunbar, court staff, the general public and the other Officers present at the time." (Doc. 109 at 11–12.) It is unclear how Ramsey's actions in the hallway outside of the courtroom could have posed a threat to the judge and courtroom staff. Also, there is no claim that Ramsey was armed or suspected to be armed; indeed, he would have gone through a security screening when he entered the courthouse. The video shows that Ramsey did not attempt to swing at an officer or make any other violent moves. Further, video shows that, when Defendant Plunkett shot Ramsey with the taser, two officers held each of Ramsey's arms, another officer held Ramsey's neck in a carotid control technique, and Ramsey was almost sitting on the floor. (Doc. 116, Video, 1:02–1:03.) A reasonable jury could find that, at the time Defendant Plunkett used significant force, Ramsey did not pose a serious threat to the Officers or others. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (the court must consider the "danger a suspect poses *at the time force is applied*") (emphasis added). Accordingly, the second *Graham* factor favors Plaintiff.

**iii) Resisting or Fleeing Arrest**

There is no dispute that Ramsey was convicted of resisting arrest by "engaging in passive resistance." Ariz. Rev. Stat. § 13-2508(A)(3). The Ninth Circuit has "long distinguished between passive and active resistance." *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021). Nonetheless, in light of his conviction, this *Graham* factor favors Defendants.

**iv) Alternative Means Available**

The Court may also consider whether alternative methods were available for subduing a suspect. *Chew*, 27 F.3d at 1441 n.5. Police officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). But "police are 'required to consider [w]hat other tactics if any were available,'" and if there were

"clear, reasonable and less intrusive alternatives" to the force employed, that "militate[s] against finding [the] use of force reasonable." *Id.* (quoting *Bryan*, 630 F.3d at 831).

Defendants do not address this factor.

Alternative means available may include whether an officer gave a warning before employing the force. *See Bryan*, 630 F.3d at 831. "Appropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may result in serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). The video evidence shows that Defendant Plunkett employed the taser approximately fifteen seconds after Ramsey exited the courtroom, and Plunkett did not give Ramsey any warning that he would be tased if he did not calm down. (Doc. 116, Video 00:47–1:04.)

In addition, the evidence shows that, while in the courtroom, Ramsey stated that he was autistic and informed the judge that he was autistic, and his mother requested an accommodation for his disability. (Doc. 110-3 at 11, Maloy Dep. 52:16–24; Doc. 130-1 at 49, Maloy Dep. 57:2–8, Dec. 16, 2002; Doc. 130-2 at 6; Doc. 130-2 at 13–14.) Defendant Plunkett averred that he heard Ramsey inform the judge that he had autism. (Doc. 110-1 at 3, Plunkett Decl. ¶ 18.) The fact that Plunkett knew Ramsey was autistic must be considered in the reasonableness determination. *See Deorle*, 272 F.3d at 1283 ("where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed"). The Ninth Circuit has explained that "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* Here, Defendant Plunkett knew Ramsey was autistic and knew Ramsey had not committed any serious crime, yet there is no evidence Plunkett considered any less intrusive means to subdue Ramsey before employing a taser in dart mode without sufficient warning.

Based on this record, this *Graham* factor weighs in Plaintiff's favor.

**v) Whether Force Used was Necessary**

The final element in the *Graham* analysis requires the Court to consider whether the "degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282. Defendants argue that it was reasonable for Defendant Plunkett to use his taser on Ramsey because "Ramsey refused to follow simple commands to calmly leave the courtroom and became aggressive," he had an "unusual and aggressive demeanor, resistive actions in the courtroom, and assaultive conduct in the hallway and posed an immediate threat" to others. (Doc. 109 at 11.) Defendants' argument is based on their version of the facts. Viewing the evidence, including the video, in the light most favorable to Plaintiff, however, Ramsey turned and walked out of the courtroom on his own, he told officers not to touch him, he never swung at or pushed officers, and, at the time Defendant Plunkett shot Ramsey with the taser, Ramsey was secured by three officers and did not pose a threat.

Further, the cases on which Defendants rely to support that Defendant Plunkett's use of force was reasonable are unhelpful. In *Draper v. Reynold*, 369 F.3d 1270, 1272, 1278 (11th Cir. 2004), a single officer stopped a truck driver on the road and, after the two were standing outside of the truck, the officer asked the truck driver five times to retrieve his logbook and insurance, but the truck driver was shouting and walked toward the officer while accusing the officer of harassment. *Id.* The truck driver then exclaimed, "just go ahead and take me to fucking jail . . . I'm not going to kiss your damn ass because you're a police officer." *Id.* at 1273. When the truck driver continued to yell, the officer shot him once with a taser. *Id.* The Eleventh Circuit found that use of a taser was reasonably proportionate to the difficult, tense, and uncertain situation the officer faced during the traffic stop. *Id.* at 1278. Conversely, Ramsey was held by three officers and was not in position to harm anyone when Defendant Plunkett tased him.

In *Roell v. Hamilton County*, police responded to a disturbance call to find Roell, wearing a t-shirt and otherwise naked, muttering unintelligibly, and standing next to a broken window holding a hose. 870 F.3d 471, 476–77 (6th Cir. 2017). After damaging

his own condominium, Roell had gone to his neighbor's and threw a flowerpot through her window and then threw the window screen at her. *Id.* at 476. The officers told Roell to calm down, but Roell faced the officers and started swinging the hose nozzle at them. *Id.* at 477. Officers told Roell to stop and get on the ground or he would be tased, and one officer arced his taser as a warning two different times, but Roell continued to approach the officers. *Id.* Roell then threw a garden basket at one officer, after which officers took him to the ground, but Roell broke free, at which point an officer tased him. *Id.* The Sixth Circuit found that the officers' use of force was likely not excessive because Roell had committed property damage, threatened his neighbor, was holding objects that could have been used as weapons, acted aggressively, approached officers while waiving a metal nozzle, and posed a threat to the officers' safety. *Id.* at 481–82. Here, Ramsey did not threaten anyone or damage property, he was secured by three officers, and, based on his conviction, he only passively resisted. Moreover, unlike the officer in *Roell*, Defendant Plunkett did not give Ramsey a warning that he would be tased if he did not calm down; he simply yelled taser a few times and immediately shot Ramsey.

In sum, a reasonable jury could find that, in the circumstances, Defendant Plunkett's use of a taser without any warning to Ramsey constituted excessive force and amounted to a constitutional violation.

**b. Qualified Immunity**

Because there is a question of fact as to whether Defendant Plunkett violated Plaintiff's Fourth Amendment right against the use of excessive force, the qualified immunity question turns on the second prong—whether the right at issue was clearly established.

Defendants argue generally that "[o]fficers who use Taser devices on individuals actively resisting arrest, or refusing lawful police commands, are uniformly granted qualified immunity in excessive force claims." (Doc. 109 at 13.) In support, Defendants cite to two Ninth Circuit cases and multiple out-of-circuit cases.

Defendants rely on *Mattos*, in which the Ninth Circuit consolidated two cases involving the use of tasers to subdue individuals. 661 F.3d at 452. In the first case, officers tased a pregnant woman in drive-stun mode three times in one minute after she refused to sign a traffic citation, refused to get out of her car, and stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from her car. *Id.* at 445–46. The Ninth Circuit found that the use of a taser constituted excessive force; however, the officers were entitled to qualified immunity because the law was not sufficiently clear at the time—2004—that such conduct was unlawful. *Id.* at 448.

In the second case, the defendant officer used a taser in dart mode against a woman who was involved in a domestic dispute with her husband; the woman stood between her husband and the police when they tried to arrest him. 661 F.3d at 438-39. When one officer moved forward, the woman extended her arm to prevent him from touching her chest; the officer asked if she was touching an officer, and, while she tried to calm everyone down, she was shot with a taser in dart mode without warning. *Id.* at 439. The Ninth Circuit held that the officer's use of a taser was unreasonable and violated the Fourth Amendment. *Id.* at 452. But the court went on to conclude that, at the time of the incident—2004—it was not clearly established that use of a taser in the circumstances was unlawful; therefore, the defendant officer was entitled to qualified immunity.

*Mattos* does not support qualified immunity for Defendant Plunkett's conduct in 2019. Instead, it put officers on notice that, as of 2011, when *Mattos* was decided, the use of a taser in situations similar to those addressed therein, i.e., where an individual is passively resisting, violates an individual's Fourth Amendment rights.

Defendants also cite *Isayeva v. Sacramento Sheriff's Department*, in which two officers responded to a domestic disturbance about a suspect with possible mental health issues refusing to leave a home. 872 F.3d at 948. The officers knew the suspect, "a very big man" who was over six feet tall and more than 250 pounds, was unarmed and his behavior confirmed that he was likely high on drugs. *Id.* at 948–49. The suspect spoke to the officers for about ten minutes, but then he became agitated; the officers grabbed each

of his arms, the suspect stiffened his arms and tried to get free, and then he pushed and resisted the officers' attempt at a control hold. *Id.* at 948. The suspect refused orders to stop resisting and struggled with the officers, "tossing them around" and "frustrat[ing] their physical efforts to constrain him." *Id.* at 948–49. The appellate court referred to the suspect's response as "violent resistance." *Id.* at 949. One officer then tased the suspect in drive-stun mode. *Id.* at 948. The Ninth Circuit held that it need not determine whether the use of the taser was reasonable under the Fourth Amendment because the officer was entitled to qualified immunity for the tasing. *Id.* at 950.

The facts in *Isayeva* differ from the instant case in that, although Ramsey appeared to be a physically healthy, strong young man, he was not significantly larger and heavier than the officers like the suspect in *Isayeva*. Ramsey was convicted of passive resistance; it was not "violent resistance," he did not push officers, and he was not "tossing" officers around. At the moment Defendant Plunkett tased Ramsey, Ramsey was restrained by three officers—one on each arm and one with a hold around Ramsey's neck, and he did not pose a threat to any of the officers. Finally, Defendant Plunkett shot Ramsey in dart mode, which is more painful and penetrating and a higher level of force than the drive-stun mode employed in *Isayeva*.

In 2001, the Ninth Circuit decided *Deorle v. Rutherford*, which involved a police response to a call that Deorle was distressed and suicidal. 272 F.3d at 1276. Deorle was verbally abusive but generally followed the officers' instructions. *Id.* At one point, Deorle brandished a hatchet at an officer, but threw it down when told to do so. *Id.* Deorle did not touch or attack anyone, but he screamed at officers. *Id.* at 1276–77. A team of negotiators was called, but before they arrived, Deorle picked up a plastic crossbow in one hand and a can or bottle of lighter fluid in the other and began shouting at the officers; the defendant officer shouted at Deorle to put the crossbow down, and Deorle did so, but Deorle continued to walk towards the officer at a steady gait. *Id.* The officer did not tell Deorle to drop the bottle or can, he did not order him to halt, and he did not warn Deorle that he would be shot. *Id.* at 1277. The defendant officer shot Deorle with a beanbag

projectile, seriously wounding him. *Id.* The Ninth Circuit denied qualified immunity to the defendant officer, even though there was no prior case prohibiting the use of a beanbag projectile in the same circumstances. *Id.* at 1285–86. The appellate court explained that "[e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285.

Here, those same factors are present. Ramsey was unarmed, he committed no serious offense, Defendant Plunkett knew that Ramsey has autism, Ramsey was not given adequate warning that a significant degree of force would be employed, Ramsey posed no risk of flight, and he posed no threat to the safety of officers or others.

Defendants insist, however, that despite Plaintiff's conviction for "engaging in passive resistance," Ramsey's conduct rose to the level of active resistance under Arizona law, and Defendants claim that the video shows active resistance. (Doc. 131 at 7–8.) In support, they cite to *Bohnert v. Mitchell*, which involved an individual found to have "actively resisted" when, after officers had to pull and tase the plaintiff to get him out of his car, the plaintiff continued to resist arrest by laying with his arms tightly under his body while kicking and screaming, and the plaintiff struggled with three officers for four to five minutes before they were able to restrain him with handcuffs and leg restraints. No. CV-08-2303-PHX-LOA, 2010 WL 3767566, at *3, 14 (D. Ariz. Sept. 21, 2010). Officers approached the plaintiff after he had been driving the wrong way on the freeway; the plaintiff refused to comply with an order to exit the car, he grasped the steering wheel and locked his legs, struggled with officers for four or five minutes, and kicked at officers during the struggle. *Id.*, at *2, 14. The district court found that the plaintiff "was actively resistant because he employed force to defeat the officers' attempts to remove him from his vehicle and to control him while on the ground." *Id.*, at *14 (internal citation omitted). Accordingly, the plaintiff was charged under § 13-2508(A) for using physical force against

a peace officer. *Id.*, at 9. Conversely, Ramsey complied with the Judge's order to leave the courtroom, and he did not swing at, push, or kick any of the officers. Ramsey was convicted under § 13-2508(C) for passive resistance, defined as a "nonviolent physical act." At the least, even with the video, there is a question of fact whether Ramsey's conduct amounted to more than passive resistance. And the Ninth Circuit has long held that there is a clearly established right to be free from the application of significant force for engaging in passive resistance or for failing to immediately comply with an officer's orders. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

In short, Defendants' argument for qualified immunity rests on their version of the facts; namely, that Ramsey was actively resisting arrest. Because there is a question of fact on this issue, summary judgment based on qualified immunity is not appropriate. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

## VI. Count Three—ADA Title II Claims Against the City

### A. Legal Standard

Title II of the ADA prohibits a "public entity" from excluding a qualified individual with a disability from participating in or being denied the benefits of the services, programs, or activities of the public entity, or being subjected to discrimination by the entity by reason of such disability. *See* 42 U.S.C. § 12132; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998); *Weinreich v. L.A. Cty. Metro. Trans. Auth.*, 114 F.3d 976, 978–979 (9th Cir.).

The term "public entity" includes state and local governments and their departments, agencies, special purpose districts, or other "instrumentalit[ies]." 42 U.S.C. § 12131(1). The Eleventh Amendment does not bar claims for damages or prospective injunctive relief against a state or state agency under Title II of the ADA because Congress validly abrogated state immunity in enacting that statute. *United States v. Georgia*, 546

U.S. 151, 159 (2006); *see Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1170–1171 (9th Cir. 2002). Under Title II of the ADA, a public entity can be held vicariously liable for its employees' conduct. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).

To seek monetary damages against a public entity, a plaintiff must allege intentional discrimination by the entity under the "deliberate indifference" standard. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon . . . the likelihood." *Id.* at 1139. This standard is not met "where a duty to act may simply have been overlooked," but rather "a failure to act must be a result of conduct that is more than negligent." *Id.*; *see Germaine-McIver v. Cty. of Orange*, No. SACV 16-01201-CJC (GJSx), 2018 WL 6258896, at *13 (C.D. Cal. Oct. 31, 2018).

**B. Discussion**

Plaintiff sets forth two claims under the ADA—one alleging the denial of a reasonable accommodation for Ramsey's traffic hearing despite his request for such prior to the hearing, and one alleging Defendant Plunkett failed to reasonably accommodate Ramsey's disability during the arrest.

**1. Denial of Accommodation During Traffic Hearing**

Defendants assert that the City, the only Defendant named in this Count, is not a proper Defendant to the extent Plaintiff's claims are directed at the actions, or failure to act, of the Lake Havasu City Municipal Court employees. (Doc. 109 at 14.) Defendants note that the Court previously held that the City was not the proper party for Plaintiff's ADA claim related to the denial of an accommodation during the traffic hearing. (*Id.*)

In its prior Order, the Court relied on *Winter v. Coor* to conclude that Lake Havasu Municipal Court was "part of the integrated judicial department of this state"; therefore, the City was not the proper Defendant for the claim that Ramsey was denied an accommodation for his traffic hearing. (Doc 42 at 12, citing 144 Ariz. 56, 59 (1985)). The *Winter* opinion cited to the State Constitution, which provides that "[t]he powers of the government of the state of Arizona shall be divided into three separate departments, the

legislative, the executive, and the judicial . . . " and "[t]he judicial power shall be vested in an integrated judicial department consisting of a Supreme Court, such intermediate appellate courts . . . , a superior court, such courts inferior to the superior court . . . , and justice courts." Ariz. Const. art. III & art. VI, § 1. The state supreme court noted that parties in the magistrate court action could appeal to the state superior court, which was part of the state's judiciary. *Winter*, 695 P.3d at 1098. Accordingly, the state constitutional judicial independence provided for the State's judicial department extended to lower and magistrate courts. *See id.*

Plaintiff did not address Defendants' argument that the Court already determined that the City is not the proper Defendant for the ADA claim related to the denial of accommodation during the traffic hearing, nor did Plaintiff present any argument that the Court's prior determination was incorrect. Plaintiff's own evidence shows that Ramsey appealed the August 5, 2019 judgment of the Lake Havasu City Municipal Court to the Mohave County Superior Court, which is part of the state's judiciary. (Doc. 130 ¶ 26.) This confirms that the Lake Havasu City Municipal Court is part of the judicial department of the State; thus, the City is not the proper Defendant for Plaintiff's first ADA claim. Summary judgment will therefore be granted to the City as to Plaintiff's ADA claim related to the denial of an accommodation during the traffic hearing.

**2. Denial of Accommodation During Arrest**

The Ninth Circuit has recognized two types of ADA claims applicable to arrests: "(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & Cty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S. Ct. 1765 (2015). The Court previously found that Ramsey's conviction for resisting arrest precluded

a "wrongful arrest" claim under the ADA. (Doc. 42 at 13.) Therefore, Plaintiff's ADA claim is the second type—"reasonable accommodation." *See Sheehan*, 743 F.3d at 1232.

To support this type of ADA claim, a plaintiff generally must show:

> (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability.

*Id.* at 1232–33 (citing *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007)). The plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). A public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999).

Defendants dispute whether Ramsey was an individual with a disability. (Doc. 109 at 14.) Defendants assert that if Ramsey "is, indeed, autistic, he does not appear limited," and that simply "reciting his diagnosis is insufficient to show a qualifying disability." (*Id.*; Doc. 131 at 11.)

The ADA defines "disability" as (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). The statute explains that "major life activities" include, among other things, "learning, reading, concentrating, thinking, communicating, and working." *Id.* § 1212(S)(A). The enabling regulations explicitly list autism as an example of a disabling impairment. 29 C.F.R. § 1630.2(j)(3)(iii) ("it should easily be concluded that . . . autism substantially limits brain function").

The record shows that Ramsey was diagnosed with autism as a child. (Doc. 130-1 at 30, Ramsey Dep. 30:20-24; Doc. 130-1 at 127, S. Ramsey Dep. 129:8-19.) The evidence also shows that, due to his autism, Ramsey qualified for disability benefits under Social Security regulations as a child during a short period when his mother was out of work. (Doc. 130-1 at 100, S. Ramsey Dep. 16:22–19:09.) Ramsey qualified for Social Security benefits later as an adult based on a psychiatrist's evaluation and evidence that he could not hold jobs for very long. (*Id.* 21:17–22:3; 22:7–9.) Ramsey began receiving benefit payments in 2020, and the payments go to his sister, who manages his money because the Social Security Administration felt Ramsey was not capable of taking care of his own finances. (*Id.* 22:22–23:6.) Notably, Social Security regulations provide a more stringent definition of disability than the ADA. *Compare* 29 C.F.R. § 1630.2(j)(1)(ii) (ADA) *with* 20 C.F.R. § 404.1505(a) (Social Security).

Taking Plaintiff's facts as true, and pursuant to the ADA enabling regulations that list autism as a disabling impairment, Plaintiff has demonstrated that Ramsey is a qualified individual with a disability.

Further, the record shows that Defendant Plunkett and other Lake Havasu Officers knew Ramsey had a disability when they encountered him. Defendants' own evidence includes statements from Defendant Plunkett and other Officers attesting that, in the courtroom, Ramsey's behavior appeared "out of the ordinary" and abnormal; that his conduct "was a little off"; that he was rocking back and forth; that he was "causing a disturbance"; that he would not listen to the judge; and that he kept saying he did not understand. (Doc. 110-1 at 89, Sondrol Dep. 31:1–7; Doc. 110-3 at 5, Maloy Dep. 44:4–7; 47:13–16; 50:14–19; 52:4–6; 54:15–21; Doc. 110-4 at 9, Dailey Dep. 67:18–22; 69:15–16, 74:17–75:2; Doc. 110-1 at 3, Plunkett Decl. ¶¶ 7–11, 22.) More importantly, the Officers were in the courtroom when both Ramsey and his mother informed the court that he had autism. (Doc. 110 ¶ 9; Doc. 130, PSOF ¶ 9; Doc. 130-1 at 49, Maloy Dep. 57:2–11; Doc. 130-1 at 93; Doc. 130-2 at 13–14.) As noted, during his traffic hearing, Ramsey

told the judge he had a disability, and Ramsey's mother stood up and told the judge he needed to allow her son certain rights due to his disability. (Doc. 130-2 at 13–14.)

The Court therefore turns to whether the City discriminated against Ramsey by failing to provide a reasonable accommodation during the Officers' encounter with and arrest of Ramsey. *See Sheehan*, 743 F.3d at 1233. For guidance on this element, the Court looks to the Ninth Circuit's decision in *Sheehan*. There, a mentally disabled woman was shot by police in her own bedroom while suffering a psychotic episode. *Id.* at 1215. Officers entered Sheehan's room in a group home without a warrant, causing her to react with violent outrage. *Id.* Sheehan claimed that the city failed to provide a reasonable accommodation when the officers forced their way back into her room without taking her mental illness into account or "employing generally accepted police practices for peaceably resolving a confrontation with a person with mental illness." *Id.* at 1217. Sheehan asserted that "the officers should have respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation." *Id.* at 1233. The appellate court determined that summary judgment was inappropriate because the officers had an opportunity to wait for backup and employ less confrontational tactics, including the accommodations asserted by Sheehan. *Id.*

Here, Plaintiff argues that the Officers were on notice that Ramsey had autism, which called for a particular restraint on the use of force. (Doc 129 at 16.) *See Deorle*, 272 F.3d at 1283. In the Second Amended Complaint, Plaintiff asserted that Defendant Plunkett "could have made the reasonable accommodation of . . . permitting Ramsey to exit the courtroom free from unlawful interference" or employed "generally accepted police tactics to peaceably d[e]fuse the confrontation." (Doc. 13 ¶¶ 23, 28). In opposition to summary judgment, Plaintiff presented a report and deposition testimony from Jeffeory Hynes, a professor at Glendale Community College, who previously worked as a Phoenix Police Commander for 32 years. (Doc. 130-3 at 37.) Dr. Hynes explained that pursuant to Arizona Peace Officers Standards and Training Board (AZPost) training, which is

mandated for all officers in Arizona, accepted police tactics for officers who encounter subjects with a mental health issue include "be calm and non-confrontational," "avoid touching . . . the person," "be patient . . . reassuring, empathetic," "move as slowly as the situation permits," "avoid sudden, surprising movements," "tell the subject they are safe," "only one (1) officer at a time should verbally engage the subject," and "slow the situation down." (*Id.* at 42–43.) Dr. Hynes testified that, under AZPost guidelines, before you grab someone with a mental health issue or autism, you should first communicate with the individual and explain your actions. (Doc. 130-1 at 34, Hynes Dep. 145:12–20, Jan. 10, 2023.) According to Dr. Hynes, the use of force incident that occurred—from the escort of Ramsey out of the courtroom to the carotid control technique and use of a taser without a proper warning—could have been avoided if the Officers had accommodated Ramsey's disability of autism and followed "best practice" protocols for contacts with subjects who have a mental illness or disability. (Doc. 130-3 at 51–52.)

Viewing the evidence in Plaintiff's favor, a reasonable jury could agree that reasonable accommodations were available when the Officers arrested Ramsey, but they failed to provide any. *See Sheehan*, 743 F.3d at 1233 ("the reasonableness of an accommodation is ordinarily a question of fact"). Accordingly, summary judgment will be denied as to Ramsey's "reasonable accommodation" ADA claim against the City.

## VII. Count Four—Battery Against the City and Plunkett

### A. Legal Standard

To prove battery, a plaintiff must show that the defendant acted with the intent to (1) cause a harmful or offensive contact with another person, or cause another person apprehension of an immediate harmful or offensive contact, and (2) that the contact occurred. *E.E.O.C. v. GLC, Rest., Inc.*, No. CV 05-0618 PCT-DGC, 2006 WL 3052224, at *11 (D. Ariz. Oct. 26, 2006); see Restatement (Second) of Torts (1965) §§ 13–20; *see also Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1016 (D. Ariz. 2012) (defendant police officers liable for battery). "[A] suit for a police officer's use of excessive force

necessarily involves the intentional tort of battery." *Ryan v. Napier*, 425 P.3d 230, 236 (2018).

With regard to the use of physical force by police officers, state law provides a justification defense as follows:

> A person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that other person, such person uses or threatens to use physical force and all of the following exist:
>
> 1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
>
> 2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
>
> 3. A reasonable person would believe the arrest or detention to be lawful.

Ariz. Rev. Stat. § 13-409. "If the officer's use of force is justified under § 13-409, the officer is immune from civil liability." *Ryan*, 425 P.3d at 239. However, "although the use of force can be justified at its commencement, it loses legal justification at the point the force becomes unnecessary." *Id.*; *see Dist. of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. Cir. 2003) (acknowledging that officers lose the privilege to use physical force when it "crosse[s] the line of permissible force"). A defendant bears the burden of proving a justification defense in a civil case. *Ryan*, 425 P.3d at 240–41.

**B. Discussion**

The video evidence supports that, in grabbing Ramsey's arm, holding Ramsey so that he could not walk away, placing a carotid control hold around Ramsey's neck, and tasing Ramsey, the officers intended to cause harmful contact with Ramsey and the contact occurred, thereby meeting the elements of battery. *See GLC, Rest., Inc.*, 2006 WL 3052224, at *11.

Defendants argue that Plunkett and the other Officers' conduct was within their official duties and was reasonable because Ramsey was making clear efforts to resist and

break free of the Officers. (Doc. 109 at 17–18.) Defendants therefore claim that justification must be applied. (*Id.* at 18.)

As discussed above, there is a material factual dispute as to whether Defendant Plunkett's use of a taser without any warning to Ramsey constituted excessive force. Further, construing the evidence in Plaintiff's favor and viewing the facts as depicted in the video, a reasonable jury could find that no force was necessary when Plunkett grabbed Ramsey's arm as he walked out of the courtroom or when Officers grabbed and held Ramsey and placed him in carotid control hold. In light of the material issue of fact over whether the Officers' use of force was reasonable under the circumstances, it cannot be said that a "reasonable person would believe that such force [was] immediately necessary to effect the arrest." Ariz. Rev. Stat. § 13-409(2). A determination of immunity under § 13–409 therefore requires the resolution of genuine issues of material fact. Summary judgment in favor of Defendants on the issue of immunity under § 13–409 will be denied, and summary judgment will be denied as to the battery claim against Defendant Plunkett and the vicarious liability claim against the City in Count Four.

**VIII. Punitive Damages**

Defendants argue that punitive damages against Defendant Plunkett on the battery claim are not allowed under Arizona Revised Statutes § 12-820.04. (Doc. 109 at 18.) Plaintiff did not respond to and thus did not oppose this argument. (*See* Doc. 129.)

Punitive damages are not available against public employees acting within the scope of their employment under Arizona Law. Ariz. Rev. Stat. § 12-820.04; *Spears v. Ariz. Bd. of Regents*, 372 F. Supp. 3d 893, 925-26 (D. Ariz. 2019). Accordingly, summary judgment will be granted on the issue of punitive damages against Plunkett on the battery claim.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 109).

(2) Count Two, which alleges violation of the Rehabilitation Act, 29 U.S.C. 794, against Lake Havasu City is **dismissed**.

(3) Defendants' Motion for Summary Judgment (Doc. 109) is **granted in part** and **denied in part** as follows:

(a) the Motion is **granted** as to the ADA claim against the City based on the alleged denial of a reasonable accommodation during the traffic hearing (within Count Two);

(b) the Motion is **granted** as to the issue of punitive damages against Plunkett on the battery claim (within Count Four); and

(c) the Motion is otherwise **denied**.

(4) The remaining claims are:

(a) Count One–Fourth Amendment excessive force claim against Defendant Plunkett;

(b) Court Three–ADA claim against the City based on the denial of a reasonable accommodation during arrest; and

(c) Court Four–state law battery claim against Defendant Plaintiff and vicarious liability claim against the City.

(5) This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(6) The parties must jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

(7) The parties must file a joint status report **within thirty (30) days** following the settlement conference, if it is not successful, proposing dates to file their joint proposed pretrial order.

Dated this 27th day of September, 2023.

Douglas L. Rayes
United States District Judge